IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KATHLEEN DOTY,                          §
                                        §
        Plaintiff,                      §
                                        §
v.                                      §       CIVIL ACTION NO. H-06-1869
                                        §
SUN LIFE ASSURANCE COMPANY              §
OF CANADA,                              §
                                        §
        Defendant.                      §

MEMORANDUM AND ORDER

Pending are Plaintiff Kathleen Doty's Motion for Summary Judgment (Document No. 15) and Defendant Sun Life Assurance Company of Canada's Cross-Motion for Summary Judgment (Document No. 21). After having carefully reviewed the motions, responses, reply, surreply, and applicable law, the Court concludes as follows:

I.   Background

Plaintiff Kathleen Doty ("Plaintiff") alleges that Defendant Sun Life Assurance Company of Canada ("Defendant") wrongfully denied her continuing long-term disability benefits under her employer's long-term disability plan. Prior to claiming disability, Plaintiff was employed by the Clear Creek Independent School District ("CCISD") for approximately eight years as a math special education teacher for 6th, 7th, and 8th grades. CCISD

sponsored an employee disability plan that provided long-term disability ("LTD") benefits (the "Plan"). Benefits under the Plan were funded, "at least in part," by a group LTD policy (the "Policy") issued by Defendant. *See* Document No. 35 at 3. The Plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Plaintiff is a 55-year-old married woman with two children. She was hired by CCISD in 1994. In 1996, Plaintiff began experiencing symptoms including neck spasms and pain, an involuntary turning and tilting of the head to the right side, and a mild action tremor in her upper extremities. That same year, she was diagnosed as having cervical dystonia, and she began receiving treatment from Dr. Joseph Jankovic and Dr. William Ondo at Parkinson's Disease Center and Movement Disorder Clinic of Baylor College of Medicine.[1] Plaintiff began receiving injections of Botulinum toxin approximately every three to six months to lessen

---

[1] Dystonia is a disorder "dominated by sustained muscle contractions, which frequently cause twisting and repetitive movements or abnormal postures." Document No. 16 ex. H at DOTY 000265. "Dystonia of the neck muscles results in a condition characterized by abnormal head and neck posture called cervical dystonia," which is also known as "spasmodic torticollis." *See* id. at DOTY 000253. Patients with this disorder may experience "jerky movements of the head and intermittent or constant head deviation at rest." *See* id. "Botulinum toxin injections into the overactive muscles appear to be the most effective treatment for cervical dystonia . . . ." Id. ex. Q at DOTY 000341.

the involuntary muscle movements.  In 1999 and 2000, Plaintiff had two denervation surgeries performed by Dr. Robert Grossman, Chief Neurosurgeon of Baylor College of Medicine, which Plaintiff reported to have a positive but limited effect on the dystonia. *See* Document No. 16 ex. P at DOTY 000296.[2]  Plaintiff has also been diagnosed with depression, which predates the dystonia, and she was diagnosed with interstitial cystitis in 2002.  <u>Id.</u> ex. Q at 946.

Plaintiff contends that, even after the denervation surgeries, she experienced pain and muscle spasms in her neck, upper back, and lower head, as well as pain in her lower abdomen while working as a teacher.  She took medication including muscle relaxants, which she reported to cause "a state of disorientation, disorganization, [and] loss of memory . . ."  *See* <u>id.</u> ex. A at 87.  Plaintiff continued teaching, however, until September, 2002, when she gave it up because "I was exhausted, was not doing a good job and my doctors insisted that I stop teaching for the sake of my health." <u>Id.</u> at 88.

In 2002, Plaintiff applied for short term disability ("STD") and long term disability ("LTD") benefits under the Plan.  She

---

[2]   The Court will hereinafter refer to pages in the administrative record solely by number.  For example "Document No. 16 ex. P at DOTY 00296" will become "Document No. 16 ex. P at 296," and "Document No. 22 ex. 1-B at DOTY POL 18" will become "Document No. 22 ex. 1-B at 18."

submitted statements from her attending physician, Dr. Ondo, who described the objective findings of her condition as "Involuntary movement of neck, spasm of neck, unable to hold head upright," and the subjective symptoms as "involuntary turning of head, neck pain, depression."   *See* id. ex. Q at 762 (statement dated January 3, 2003); *see also* Document No. 22 ex. A-2 at 51 (statement dated December 19, 2002).   Dr. Ondo found that Plaintiff could work two to three hours per day with certain restrictions, but he did not think she could work in another occupation on a full- or part-time basis and that the limitations were permanent.   Document No. 16 ex. Q at 763-64.   Plaintiff also submitted a statement from her primary care physician, Dr. Meena Eswaran, who expressed the opinion that Plaintiff was "impaired" and unable to work because she was unable to control her head movements and needed to take "strong pain medication," which affects her concentration and memory. *See* id. at 826-27.

## Relevant Plan Language and Approval of Claim for LTD Benefits

To receive LTD benefits, Plaintiff was required to be disabled under the following definition:

> **Total Disability or Totally Disabled** means during the Elimination Period and the next 36 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.

4

> After Total or Partial Disability benefits combined have
> been paid for 36 months, the Employee will continue to be
> Totally Disabled if he is unable to perform with
> reasonable continuity any Gainful Occupation for which he
> is or becomes qualified for by education, training or
> experience.

*See* Document No. 22 ex. 1-B at 18, 38.  "Gainful Occupation" is

"employment that is or can be expected to provide an Employee with

an income of at least 60% of his Indexed Total Monthly Earnings."

Id. at 15.  In February, 2003, Defendant approved Plaintiff's claim

for LTD benefits and began making payments, retroactive to

December, 2002.

## Defendant's Investigation

In September, 2004, Defendant scheduled Plaintiff for an

Independent Medical Examination ("IME") with Board Certified

neurologist Dr. Andres Keichian.  Dr. Keichian found that

Plaintiff's "primary disabling condition is dystonia," and that she

was restricted from activities such as driving, sustaining the same

posture, or performing physical activities for periods of time

exceeding one or two hours.  *See* Document No. 16 ex. Q at 917, 924.

He was of the opinion that Plaintiff could work up to four hours a

day, but not on a "consistent basis due to pain."  Id. at 918.

Defendant conducted video surveillance of Plaintiff for three

consecutive days beginning September 29, 2004.  Plaintiff was

observed leaving her home for up to approximately 5-1/2 hours at a time and performing activities such as driving to various locations, talking on her cell phone, volunteering at a local crisis center, attending church, entertaining guests in her home, and shopping and carrying groceries. *See* Document No. 22 ex. A-2 at 150-152; ex. D.

In October, 2004, Defendant notified Plaintiff by letter that it was cancelling her LTD benefits because it had determined that dystonia is a musculoskeletal and connective tissue illness, which generally is covered for only twelve months under the Plan. *See* Document No. 16 ex. Q at 500-506. Plaintiff appealed this decision and submitted evidence that dystonia is a neurological condition that would not fall under that Plan limitation. In March, 2005, Defendant notified Plaintiff that it had "received additional medical clarification," and it would reinstate her LTD benefits. *See* id. at 557-58. Defendant reminded Plaintiff that beginning in December, 2005 (when the Plan definition of "Total Disability" would change), Plaintiff's claim would be evaluated based on her ability to perform "any other occupation" for which she is qualified, not just her "own occupation." *See* id.

Defendant sent Plaintiff's file to Dr. James Sarni, a psychiatrist who specializes in physical medicine and rehabilitation. In January, 2005, Dr. Sarni reported that based on

6

the findings of Dr. Jankovic and Dr. Keichian, it was reasonable to conclude that Plaintiff could work up to four hours a day, but not on a consistent basis due to pain, and that Plaintiff "would be unable to perform her duties as a math teacher." *See* Document No. 16 ex. Q at 942-43 (report dated January 12, 2005). However, Dr. Sarni wanted to review the surveillance video, which he thought would be "truer depiction of [Plaintiff]'s functional capabilities" in a non-office setting. After reviewing the video surveillance taken on September 29, 2004, Dr. Sarni submitted a supplemental report. He found that there was "absolutely no evidence of any rotation of the head, rotating or pulling toward one side, [or] any evidence of any jerking or unusual movements," which "would imply that the torticollis and dystonia . . . is relatively mild" and "not severe enough to alter the way [Plaintiff] carries her head and functions in routine activities of daily living." *See* id. at 944. Therefore, he concluded that restrictions of six hours sitting, one to two hours walking, and no lifting would be "extremely reasonable."

Defendant conducted additional surveillance on six days in April and May, 2005, during which time Plaintiff was observed volunteering at the crisis center, meeting with counsel, driving to various locations, and carrying groceries. *See* Document No. 22 ex. A-2 at 206-10; ex. D.

In October, 2005, Defendant scheduled a second IME for Plaintiff, this time with Board Certified neurologist Dr. Christopher Loar.[3]  Dr. Loar was unable to confirm a diagnosis of cervical dystonia based on Plaintiff's exam and history, although he did note that Plaintiff's exam revealed "pain, tenderness and muscle tension in the cervical soft tissues."  *See* id. ex. Q at 926.  Dr. Loar noted that Plaintiff has "considerable evidence of a depressive illness," and in his opinion "depression plays a major role in Ms. Doty's perceived disability."  He stated that, in his experience, dystonia "usually does not produce work

---

[3] Dr. Loar, according to a printout from his website that is part of the administrative record, is a specialist in Texas Worker's Compensation medical examinations, who is able to provide "[r]apid turnaround on written report," mostly within 24 hours of examining the person, and offers to fax the report to the adjuster "for more rapid delivery."  Document No. 16 ex. L at 284.  One cannot help but empathize with Plaintiff's impressions of her examination by Dr. Loar:

> Dr. Loar walked in and then introduced himself, never making eye contact.  He sat at his computer and began typing. . . .  He began: "Your name is Kathleen Doty, is that correct?" and he typed the entire time I answered questions. . . .  During the physical exam, Dr. Loar never looked me straight on face to face, where you can see that from the constant contraction, my neck does not sit square on my shoulders, rather way to the side.  This has been a result of my dystonia but he apparently did not see this since it is not in his report.

*See* id. ex. A at 99, 101.  According to Dr. Loar, his exam took about one hour on October 3, 2005.  True to his rapid turnaround claim, he issued his report the next day.

8

restrictions or restrictions of activities of daily living until very late in the course of the disorder, when the neck muscle contractions limit the way that the patient holds her head and neck." He did not believe that work restrictions were necessary for Plaintiff at this time because she is "able to perform her activities of daily living and therefore could tolerate sedentary work duties." Id. He also stated that it was not clear from Plaintiff's history that "anything changed or developed" to cause Plaintiff to stop working in September, 2002. Id. at 928.

That same month, Dr. Alan Neuren (Board Certified in Neurology and Psychiatry), conducted an independent medical review of Plaintiff's file. He stated that "[c]linical notes generally report a moderate to marked improvement in severity and function lasting until the next treatment." Id. at 901. He observed that Plaintiff in the surveillance video did not "ever demonstrate any findings of dystonia" over "a period of several days," and she spent several days working as a volunteer, which indicates that Plaintiff "has work capacity and is not impaired by torticollis [or cervical dystonia]." Id. at 902. Dr. Neuren found, based on Plaintiff's observed activity, that the disorder is "either in remission or under excellent control by the treatment she has been receiving." He agreed with Dr. Loar that it would be unusual and inconsistent, except in late stages of dystonia, for the condition

9

to produce work restrictions, and he noted that the record did not show any worsening or deterioration of Plaintiff's condition at the time she stopped working.  Therefore, he concluded that Plaintiff should be able to work in a light to sedentary capacity on a full-time basis, with restrictions of no prolonged writing and no requirement that she maintain her head in a fixed position.

A vocational review was conducted in October, 2005.  The reviewer indicated that "[r]ecent medical input" demonstrated that Plaintiff could work in a full-time sedentary to light work capacity, with no prolonged writing or requirement that she maintain her head in a fixed position.  See <u>id.</u> at 1006.  The reviewer concluded that sufficient alternative jobs were available in Plaintiff's geographic area and at the targeted wage for which Plaintiff could compete and maintain a job, including such jobs as customer service representative, receptionist, and file clerk.

<u>Denial of Continuing LTD Benefits and Plaintiff's Appeal</u>

On December 5, 2005, Defendant denied further LTD benefits. Defendant explained by letter that after evaluating medical records provided by Plaintiff's doctors, the results of the two IMEs, the medical consultant reviews, the surveillance videos, and other documentation, it had determined that Plaintiff no longer satisfied the Plan definition of total disability because she has

10

"demonstrated significant functional capabilities and retains the functional capacity to perform [full-time] gainful employment . . ." *See* id. at 702-08.

Plaintiff appealed Defendant's decision and submitted additional information, including new statements from Plaintiff, Plaintiff's husband, and Dr. Ondo. Dr. Ondo stated that, "[o]verall, [Plaintiff] has had a reasonably good response to treatment; however, she remains with extremely tight and painful muscles," and "[s]itting in positions for a long time will tend to worsen the pain and muscle spasms." *See* id. at 120 (statement dated January 26, 2006). He stated that Plaintiff "would have great difficulty working a desk job for eight hours a day," although she "could probably work part time or intermittently."

Defendant hired Dr. James Fegan, of "Professional Disability Associates," to review Plaintiff's file in 2006. Dr. Fegan, who lists as his "credentials" the American Academy of Physical Medicine and Rehabilitation and the American Association of Neuromuscular and Electrodiagnostic Medicine, does not claim to be Board Certified in any medical specialty. Dr. Fegan wrote a 26-page report, in which he acknowledged Dr. Ondo's "national if not international acclaim," but he disagreed with Dr. Ondo's conclusion that Plaintiff was disabled, citing "sparse" notes, discrepancies in Plaintiff's capacity rating compared with the reported

11

effectiveness of treatment, and a lack of objective evidence to support the Attending Physician Statements. *See* Document No. 16 ex. Q at 969. He also found that Plaintiff's subjectively reported symptoms were "dramatic" and did not "correlate with her observed activities raising credibility issues." Id. He concluded:

> This 54 year old woman who carries the diagnosis of cervical dystonia, regarded by majority to be a neurological disease. . . . has had a successful course of treatment that is ongoing to maintain control of the disease. She has demonstrated capabilities that are beyond her subjective complaints. There is not objective medical evidence of her inability to work in a sedentary capacity meaning an 8 hour day. Subjective complaints and exam room behaviors inconsistent with her diagnosis and descriptions of her impairments e.g. give-way weakness and community observed behavior raise credibility issues of claimant report. Restrictions placed on her are largely due to subjective complaints and even then work capacity was opined as high as . . . sedentary activity 4 hours intermittently the latter driven again by claimant report[,] all the while Dr. Ondo is reporting disease stability and maximum treatment effect durations covering most if not all the treatment cycle.
>
> There is not objective evidence that her other diagnoses interstitial cystitis and depression prevent sedentary work. . . .

Id. at 972.

In May, 2006, Defendant affirmed its decision to terminate Plaintiff's benefits, stating that, after a "complete review" of Plaintiff's file, it had determined that Plaintiff "has the capacity to perform the essential duties of any occupation within

12

the restrictions and limitations as provided, and that she does not
satisfy the policy definition of 'Total or Partial Disability'"
. . ." *See* id. at 732-36.

Plaintiff filed this action pursuant to ERISA § 502(a)(1)(B),
29 U.S.C. § 1132(a)(1)(B).  Plaintiff alleges that Defendant's
denial of benefits was arbitrary and capricious, and that
Defendant's "review and handling of this matter has been a breach
of its fiduciary duty."  Plaintiff seeks disability benefits under
the Plan, attorney's fees, and further relief as is just.  *See*
Document No. 1 at 5.  It is uncontroverted that Plaintiff exhausted
her administrative remedies prior to filing suit.

Plaintiff moves for summary judgment that Defendant abused its
discretion in terminating her benefits because, *inter alia*,
Defendant's decision was not rational and lacked concrete evidence.
Defendant cross-moves for summary judgment that as a matter of law
it did not abuse its discretion in terminating Plaintiff's LTD
benefits.

## II.  Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered
forthwith if the pleadings, depositions, answers to interroga-
tories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact

13

and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.  Id.  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsu-

14

shita, 106 S. Ct. at 1351).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper."  Id.  Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial."  Anderson, 106 S. Ct. at 2513.

### III.   Discussion

#### A.   ERISA Standard of Review

ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators.  See 29 U.S.C. § 1132(a)(1)(B).  "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Estate of Bratton v. Nat'l Union Fire Ins. Co., 215 F.3d 516, 521 (5th Cir. 2000) (citing Firestone Tire and Rubber Co. v. Bruch, 109 S. Ct. 948, 956-57 (1989)).  When a plan administrator or fiduciary is given discretionary authority, however, a denial of benefits is reviewed for an abuse of discretion.  Ellis v. Liberty Life Assur. Co., 394 F.3d 262, 269 (5th Cir. 2004); Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 395

(5th Cir. 2006).   Here, the parties agree that the Plan vests
Defendant with discretionary authority.   *See* Document No. 22 ex.
1-B at 58.   Moreover, Plaintiff has not challenged Defendant's
interpretation of any Plan term, but rather claims that Defendant
erred in determining that she was not totally disabled under the
Plan.   "Accordingly, this case turns on [Defendant]'s factual
determination that [Plaintiff] is not totally disabled." <u>Chandler</u>
<u>v. Hartford Life</u>, 178 Fed. Appx. 365, 369 (5th Cir. Apr. 28, 2006)
(per curiam) (unpublished).   "[A] factual determination, such as
whether a beneficiary is totally disabled under the terms of a
plan, always warrants an 'abuse of discretion' review." <u>Gellerman</u>
<u>v. Jefferson Pilot Fin. Ins. Co.</u>, 376 F. Supp. 2d 724, 731 (S.D.
Tex. 2005); *see also* <u>Chandler</u>, 178 Fed. Appx. at 369; <u>Meditrust</u>
<u>Fin. Servs. Corp. v. Sterling Chems., Inc.</u>, 168 F.3d 211, 213 (5th
Cir. 1999).

To determine whether an administrator abused its discretion in
denying benefits, the court inquires whether the administrator
acted arbitrarily or capriciously. <u>Meditrust</u>, 168 F.3d at 214.   An
administrator's decision should be affirmed if supported by
substantial evidence, and is arbitrary "only if 'made without a
rational connection between the known facts and the decision or
between the found facts and the evidence.'" <u>Id.</u> at 215 (quoting
<u>Bellaire Gen. Hosp. v. Blue Cross Blue Shield</u>, 97 F.3d 822, 828-29

16

(5th Cir. 1996)); *see also* <u>Lain v. UNUM Life Ins. Co. of Am.</u>, 279 F.3d 337, 342 (5th Cir. 2002) ("An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.'") (quoting <u>Vega v. Nat'l Life Ins. Servs., Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999) (en banc)).   The district court, in reviewing the administrator's decision, should consider only the evidence that was before the administrator.   *See* <u>Meditrust</u>, 168 F.3d at 215.

Here, Defendant has an "inherent conflict of interest" because it serves both as the administrator and insurer under the Plan. *See* <u>Robinson</u>, 443 F.3d at 395.   "A conflicted administrator merits less deference."   <u>Id.</u>   The Fifth Circuit applies a "sliding scale" to determine how much deference to give: "[t]he greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be."   <u>Vega</u>, 188 F.3d at 299; *see also* <u>Estate of Bratton</u>, 215 F.3d at 521 n.4. Where there is no evidence of a conflict other than a defendant's position as both the insurer and the administrator, the court should afford the decision "only a modicum less deference" than it would otherwise.   *See* <u>Matney v. Hartford Life & Acc. Ins. Co.</u>, 172 Fed. Appx. 571, 573 (5th Cir. Mar. 27, 2006) (unpublished) (citing <u>Vega</u>, 188 F.3d at 301); <u>Robinson</u>, 443 F.3d at 395.   "Under this standard, the basis for [Defendant]'s decision must be supported by

some concrete evidence in the administrative record." Robinson, 443 F.3d at 395 (quoting Vega, 188 F.3d at 302).

Plaintiff argues that Defendant's decision as a self-interested administrator should be afforded a "minimum of deference" because it has demonstrated a pattern of bias and self-interest, including (1) initially denying Plaintiff's benefits "with no real investigation" by wrongly classifying cervical dystonia as a musculoskeletal condition not covered by the Policy; and (2) disregarding the opinion of its own examining neurologist, Dr. Keichian. *See* Document No. 16 at 31-32. Defendant argues that its decision should be entitled to "all but a modicum" of deference due to (1) its efforts to provide a "full and fair review" (including conducting two independent medical examinations, several days of surveillance, and multiple medical reviews), and (2) its reliance upon an independent medical examination to mitigate any potential conflict of interest. *See* Document No. 22 at 15-16. Plaintiff has shown some probative evidence of Defendant's conflict of interest in serving as administrator of the plan for which it is also the insurer, and its initial misclassification of cervical dystonia as a non-covered musculoskeletal condition is enough to raise a hint of suspicion about Defendant's fairness, although Defendant later acknowledged its error and reinstated benefits. It is therefore appropriate to apply somewhat less deference to

18

Defendant's decision.  *See* <u>Vega</u>, 188 F.3d at 297 ("The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be.").

B.    <u>Defendant's Decision to Terminate LTD Benefits</u>

Defendant terminated Plaintiff's LTD benefits in December, 2005, when the Plan definition of "Total Disability" became more demanding by requiring Plaintiff to demonstrate an inability to perform with reasonable continuity "any Gainful Occupation" for which she is qualified.  Plaintiff contends that Defendant abused its discretion in determining that she was not totally disabled under the heightened standard for this new definition.  As set forth above, the Court is constrained to review this factual determination for abuse of discretion although Defendant's innate conflict of interest warrants a modicum less deference to the administrator's decision.   "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on the continuum of reasonableness--even if on the low end."  *See* <u>Vega</u>, 188 F.3d at 297.

The administrative record reflects that in its December 5, 2005, and May 6, 2006, letters to Plaintiff, Defendant recited multiple reasons to terminate Plaintiff's LTD benefits.  Among

other things, Defendant relied on (1) the IME by Board Certified
neurologist Dr. Loar, who found that depression plays a major role
in Plaintiff's "perceived" disability, and concluded that Plaintiff
could tolerate sedentary work duties because she could perform the
activities of daily living and it was unclear what "changed or
developed" to cause Plaintiff to stop working; (2) nine days of
surveillance videos over a larger period of time while Plaintiff
was receiving disability payments that showed Plaintiff on those
days able to perform activities such as driving on a busy highway,
volunteering at a crisis center for several hours at a time, and
shopping and carrying groceries with "no evidence of any rotation
of the head, rotating or pulling toward one side, [or] any evidence
of any jerking or unusual movements" and head movements that
appeared "smooth and uninhibited"; (3) the independent medical
review of Plaintiff's file by Dr. Neuren (Board Certified in
Neurology and Psychiatry), who from a file review concluded that
there was no demonstration of any deterioration of Plaintiff's
condition at the time she stopped working, from which he inferred
that she stopped working due to the stress of a higher workload
rather than a worsening of torticollis, and that Plaintiff's
"observed activity would indicate that her [cervical dystonia] is
either in remission or under excellent control by the treatment she
has been receiving"--both of which he claimed supported his

conclusion that Plaintiff should be capable of working in a light to sedentary capacity on a full-time basis; (4) Dr. Sarni's finding from his review of the file and viewing of the surveillance video, that there was "absolutely no evidence of any rotation of the head, rotating or pulling toward one side, [or] any evidence of any jerking or unusual movements," which "would imply that the torticollis and dystonia . . . is relatively mild" and "not severe enough to alter the way [Plaintiff] carries her head and functions in routine activities of daily living"; (5) a vocational review that identified alternative jobs for Plaintiff that required a sedentary to light capacity; and (6) Dr. Fegan's file review and 26-page report, which took issue with the opinions of Plaintiff's treating physicians, questioned Plaintiff's credibility based on her "dramatic" descriptions of her symptoms that were seemingly contradicted by her observed activities, and found no "objective medical evidence" supporting an inability to work in a sedentary capacity on a full-time basis. *See* Document No. 16 ex. Q at 702-09 (December 5, 2005 letter); id. at 732-36 (May 6, 2006 letter).

Plaintiff places special weight on the conclusions of her own treating physicians who are all highly respected and two of whom are specialists in cervical dystonia, and whose opinions support a finding of total disability. Nothing in ERISA, however, "suggests that plan administrators must accord special deference to the

21

opinions of treating physicians." Black & Decker Disability Plan v. Nord, 123 S. Ct. 1965, 1966 (2003). Moreover, courts may not "impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. at 1967. Here, the record recites that Defendant and its reviewing physicians at least considered Plaintiff's treating physicians' diagnoses and opinions, although Defendant "was not required to give those opinions determinative weight." Vercher v. Alexander & Alexander Inc., 379 F.3d 222, 233 (5th Cir. 2004); see also Chandler, 178 Fed. Appx. at 369; Dubose v. Prudential Ins. Co. of Am., 85 Fed. Appx. 371, 372 (5th Cir. Dec. 24, 2003) (an independent medical examiner's evaluation of patient's medical record was "substantial evidence" supporting Prudential's rejection of disability claim notwithstanding finding of treating physician that patient was totally disabled); Horton v. Prudential Ins. Co. of Am., 51 Fed. Appx. 928, at *3 (5th Cir. Oct. 8, 2002); Noble v. Ingalls Shipbuilding, No. 1:04 CV 577, 2006 WL 839519, at *4 (S.D. Miss. Mar. 29, 2006) ("[The plan administrator] was entitled to base its denial upon the independent consultants' opinions even though the opinions conflicted with [the plaintiff]'s treating physicians' opinions [that found plaintiff totally disabled]."); Dowdy v. Hartford Life & Acc. Ins. Co., 458 F. Supp. 2d 289, 303-04 (S.D. Miss. 2006) ("[A] dispute in the record among

medical professionals . . . is not enough for this court to
conclude that [a plan administrator] lacked substantial evidence to
support its determination."); <u>Braddock v. Baker Hughes Inc. Long
Term Disability Plan</u>, 461 F. Supp. 2d 490, 501 (S.D. Miss. 2006)
(same).[4]

Plaintiff contends that Defendant failed to engage appropriate
experts because cervical dystonia is an uncommon disease, and
Defendant should have retained physicians "specializing in movement
disorders."  Plaintiff speculates that Drs. Loar, Neuren, Sarni,
and Fegan had no previous experience with Plaintiff's medical
condition and are not qualified to render an opinion.  Indeed, none
of those experts claims to have had any clinical experience in
treating patients with cervical dystonia.  For support, Plaintiff
cites <u>Woo v. Deluxe Corp.</u>, 144 F.3d 1157 (8th Cir. 1998), in which
the Eighth Circuit found that a plan administrator failed to use
proper judgment when it was "confronted with medical evidence of an
uncommon disease and the opinions of two treating physicians
stating that [plaintiff was disabled]," but it "merely had an in-
house medical consultant review [plaintiff's] claim for benefits"

---

[4] If the Court had the luxury of making a *de novo* review,
weighing the evidence and considering the credibility of the
witnesses, a conclusion could well be reached to follow the
recommendations of those of Plaintiff's treating physicians who are
preeminent specialists in cervical dystonia; but the standard here
is whether Defendant abused *its* discretion in making *its* judgment.

and did not engage a scleroderma expert or seek an independent
medical review. *See* id. at 1161. One court has described Woo as
standing for "the proposition that a claimant's file should be
reviewed by a practitioner with sufficient training and experience
to competently address the claims at issue." Sexton v. Deloitte &
Touche LTD Plan, 02-1098RHK/AJB, 2003 WL 1701382 (D. Minn. Mar. 27,
2003) (holding that administrator committed a serious procedural
irregularity by merely assigning a psychologist and psychiatrist to
review the file of a patient with multiple sclerosis where fatigue
was a "significant issue in [plaintiff's] claim," and the
administrator's decision "meant that [plaintiff's] claims of
MS-related fatigue were not addressed by a physician with
sufficient training and experience to rule out a physiological
cause for her complaint."); *see also* Weidner v. Fed. Express Corp.,
No. 04-4477, 2006 WL 1283799, at *7 (D. Minn. May 9, 2006)
(distinguishing Sexton, because administrator retained two
neurologists to review the file of claimant with MS; hence, file
was reviewed by physicians who presumably "had experience with
MS").

      Here, the facts are more akin to Weidner than Sexton. It is
uncontroverted that Defendant engaged and relied upon two
independent Board Certified neurologists to examine Plaintiff's
claims related to cervical dystonia, and even though neither is

affirmatively shown to have treated cervical dystonia patients, their expertise in neurology would presumably include specialized knowledge about Plaintiff's neurological condition.  These two neurologists both expressed opinions that Plaintiff should be able to work in a light sedentary job on a full-time basis.  (The third Board Certified neurologist, who was first hired by Defendant to perform an IME, reached a contrary conclusion, finding that Plaintiff could not work more than four hours at a time and then, not on a consistent basis because of pain.)  The two neurologists upon whom Defendant relies at least stand apart from the "mere[] . . . in-house medical consultant review" that Woo found was inadequate.  Moreover, one of these neurologists performed an IME and examined Plaintiff personally, and the other conducted an independent review of Plaintiff's file, including the surveillance video.  On this administrative record the Court cannot find that Defendant's retained Board Certified neurologists did not have "sufficient training and experience competently to render medical opinions on Plaintiff's claims or that Defendant could not reasonably rely on their opinions.  See, e.g., Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998); Horton v. Prudential Ins. Co. of Am., 51 Fed. Appx. 928, at *2-3 (5th Cir. 2002).

Plaintiff also argues that Defendant has improperly "cherry-picked" evidence by "picking and choosing" evidence upon which to rely, such as disregarding the opinion of its first examining physician, Dr. Keichian. *See* Document No. 16 at 29 (citing Gellerman, 376 F. Supp. 2d at 734; Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 362 (6th Cir. 2002)). Defendant responds that it utilized a "multi-disciplinary medical evaluation by three neurologists, two physical medicine and rehabilitation experts, and a vocational expert," and each reviewer considered information provided by medical professionals that had previously analyzed the claim (including Dr. Keichian's report). Defendant clearly chose which of the conflicting opinions and evidence it would rely upon, but the record here is distinguishable from the administrators' conduct in Gellerman and Spangler. In Gellerman, although there was "overwhelming evidence" of plaintiff's disability and "no evidence contradicting the conclusions of the plaintiff's doctors or the FCE evaluator," the administrator acted improperly by picking and choosing favorable aspects of the FCE report and selectively quoting statements of plaintiff's doctors to support a decision to terminate benefits. In Spangler, the administrator acted improperly by sending a single aberrational treating physician's report to a vocational consultant in hopes of obtaining a favorable report as to plaintiff's ability to work, and

then relied upon the "incomplete and inaccurate" vocational report
to terminate LTD benefits.  In the instant case, however, there is
no evidence that Defendant provided incomplete information to or
withheld prior medical reports from the reviewing physicians and
consultants.  At the end of the day there was concrete evidence
that Plaintiff is not able to work in any gainful occupation with
reasonable continuity, and concrete evidence to the contrary.  Not
surprisingly, Defendant chose to believe the latter, as it had
discretion to do under the terms of the Plan.

Plaintiff also disputes Defendant's interpretation of the
surveillance videos and argues that Defendant afforded the
surveillance undue weight.  Defendant contends that it was entitled
to rely on the nine days of surveillance, which show Plaintiff
engaging in routine activities and conducting herself in a "smooth
and normal fashion," despite her subjective complaints at that time
of "significant involuntary contractions that pulled her head down
and to the right; perpetual motion of her head turning; and the
need to totally concentrate on walking. . . ."  See Document No. 31
at 7 (citing Document No. 22 ex. A-2 at 512, 514, 520).  Courts
have sometimes found videos a relevant consideration.  See, e.g.,
Braddock, 461 F. Supp. 2d at 502 (defendant could conclude from
video "that plaintiff [diagnosed with inflammatory degenerative
arthritis] did not demonstrate [in the video] the physical

27

limitations and lack of functionality that would prevent him from performing a sedentary-level occupation, especially when viewed in light of the other evidence in the record"); Pylant v. Hartford Life and Acc. Ins. Co., 429 F. Supp. 2d 816, 819, 826 (N.D. Tex. 2006) (administrator properly considered video surveillance [of plaintiff diagnosed with psoriasis arthritis] which "showed a mobile person capable of performing in a sedentary occupation," and therefore contradicted "the opinions of both [plaintiff] and her physician regarding her functionality"). On the other hand, courts at times have found videos inadequate to support a determination that one is able to perform with reasonable continuity the material duties of one's occupation. See Morgan v. UNUM Life Ins. Co. of America, 346 F.3d 1173, 1178 (8th Cir. 2003) (video of plaintiff diagnosed with fibromyalgia and insomnia, driving his car, eating lunch at a restaurant, carrying light objects, sitting and reading, and stretching and doing light aerobic exercise at the gym for 45 minutes, held not to be substantial evidence to support discontinuation of plaintiff's disability benefits); Clausen v. Standard Ins. Co., 961 F. Supp. 1446, 1457 (D. Colo. 1997) (eight-hour surveillance video of plaintiff, diagnosed with Chronic Fatigue Syndrome, walking two miles with her dog and driving her car, inadequate to show that plaintiff was capable of such activity

on a sustained basis or that the video documented anything other than a good day).

It does appear that the surveillance videos here were kind of a turning point in Defendant's pursuit of additional medical reviews. Prior to obtaining the first surveillance videos in late September and first of October, 2004, Defendant's retained Board-Certified neurologist, Dr. Keichian, after conducting an IME of Plaintiff, found that her dystonia allowed her to work no more than four hours a day and then, not on a consistent basis because of pain. After obtaining the videos, Defendant hired seriatim a new stable of reviewers including Dr. Sarni (medical consultant/psychiatrist), Dr. Neuren (Board Certified neurologist), and Dr. Fegan (physical medicine and rehabilitation), and also procured from Dr. Loar (Board Certified neurologist) an IME report in which he found that no work restrictions were needed for Plaintiff.

Again, if the Court were permitted a *de novo* review of the case, the weight to be given to videos of Plaintiff functioning in a seemingly normal manner during limited numbers of hours on days when she felt well enough to go out in public might be quite different than the weight given to those videos by the insurer administrator. After all, Plaintiff concedes that there are times when she is able with great effort and strain on her neck to prevent the jerky movements, although added pain and exhaustion

follow such efforts.  She admits her ability to go to Bible study
for a couple of hours a week, run an errand afterwards, volunteer
(until more recently when it became too stressful physically and
mentally) for up to four hours a week at a shelter for battered
women, attend therapy sessions and Sunday church services, and
carry small bags of groceries.  The accounts of her "off-video"
hours would also be weighed in the balance: her need on a daily
basis to take multiple prescribed medications for pain and
discomfort, with side effects of drowsiness, fatigue, and
constipation; her inability to bend her head down to work in a
garden, mop a floor, or work at a desk or computer, without having
her neck go into spasms within fewer than 30 minutes, causing
horrible pain in her neck, back, and up behind her ears, and
usually resulting in very painful headaches and dazed eyes; her
need to treat such episodes by going to bed with a heating pad or
pads on her neck, and an ice pack on the top or side of her head
until the medication begins to take effect; her inability to walk
for more than a couple of blocks without losing balance from the
neck/head strain and walking into walls or falling off of curbs;
her loss of short term memory from the medications and pain; her
need to receive painful Botox injections every three months, with
the physician using 8-10 syringes that he injects into the base of
her skull, both sides of her neck, the back of her neck, and both

30

of her shoulders, followed by ice packs and pain medication; her irregular sleep patterns caused by pain and medication, and consequent fatigue and need for daily naps; and the like. Defendant, however, appears to have discounted Plaintiff's descriptions of her "off-video" life, choosing to believe instead its reviewers' perceptions that Plaintiff overstates her illness, in part due to her long-term depression, and that her dystonia is mild or under control with the treatments she receives such as not to prevent her from gainful occupation with reasonable continuity. Although the videos alone would not be sufficient here for an in-house physician reviewer to find no disability, they are merely part of the substantial evidence that Defendant has marshaled with its employment of two Board Certified neurologists plus other specialists who have all provided reasons for a finding of no disability.

In sum, after a thorough review of the administrative record, viewed with a lesser degree of deference to Defendant, *see* <u>Vega</u>, it must be acknowledged that Defendant has amassed substantial evidence that has a rational connection to the facts in the record for determining that Plaintiff was not disabled from "any Gainful Occupation." *Cf.* <u>Delta Family-Care Disability and Survi-vorship Plan v. Marshall</u>, 258 F.3d 834, 841 (8th Cir. 2001) (explaining that a decision to deny benefits need not be the only sensible one,

31

as long as a reasoned explanation based on the evidence is offered for the outcome), *cert. denied*, 122 S. Ct. 1173 (2002).  As shown above, Defendant's decision is based on evidence, "even if disputable, that clearly supports the basis for its denial."  <u>Lain</u>, 279 F.3d at 342; <u>Vega</u>, 188 F.3d at 299.  On this administrative record, the Court is unable to find that Defendant acted arbitrarily or capriciously within the established meaning of those terms in ERISA caselaw.

IV.  <u>Order</u>

For the foregoing reasons, it is

ORDERED that Plaintiff Kathleen Doty's Motion for Summary Judgment (Document No. 15) is DENIED, Defendant Sun Life Assurance Company of Canada's Cross-Motion for Summary Judgment (Document No. 21) is GRANTED, and Plaintiff Kathleen Doty's claims against Defendant Sun Life Assurance Company of Canada are DISMISSED.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 27TH day of April, 2007.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE